IN THE MATTER OF CHOW BICK GIT AND WONG KUEN LEONG.

---

PETITION FOR WRIT OF HABEAS CORPUS.

THE ACTS OF 30th December, 1864, and 23d June, 1868, giving to the King in Privy Council the authority to make rules and regulations for the good government and control of immigrants and constituting a Board of Immigration to superintend the introduction of immigrants are constitutional.

In the Matter of Chow Bick Git and Wong Kuen Leong.

The regulations, quoted at length in the opinion, made in pursuance of this authority, are constitutional.

On petition for *habeas corpus* to release certain immigrants who were detained by the Minister of Interior as President of the Board of Immigration until these regulations were complied with, petition denied.

BEFORE HARRIS, C. J.

This is one of a number of cases which have been brought of late, two of which have been argued, and before the Court has had time to announce an opinion, a decision has been rendered unnecessary by some one on behalf of the petitioners filing the bond required by the Minister of the Interior as President of the Board of Immigration. These petitioners arrived from China on board the steamship Septima on the 13th of February last, in company with several hundred more. At the time of the arrival of the Septima small-pox existed among her passengers, and they were removed from the vessel to the quarantine grounds. The petitioners now allege that none of them have been, or are infected with the small-pox, or any other disease dangerous to the public health, and that although the usual time for quarantine has elapsed they are still detained by order of the Minister of the Interior until they shall give sureties or evidence that they will not become a charge upon the community.

The return to the writ sets forth that the petitioners came to this country at the time and by the means stated, and that they are immigrants seeking employment as laborers in this country; and are liable to the statutes in that behalf made, to wit, on the 30th day of December, 1864, and on the 23d day of June, 1868, and the ordinances in Privy Council made by authority of the statutes. The statutes in question, as far as they are applicable to this case, are Session Laws of 1864, page 59:

"Section 1. There shall be and is hereby created a Bureau in the Department of the Interior, to be styled the Bureau of Immigration, for the purpose of superintending the importa-

tion of foreign laborers and the introduction of immigrants.

"Sec. 4. It shall be the duty of the Minister of the Interior, with the assistance of the aforesaid committee, from time to time to recommend for the adoption of His Majesty the King in Privy Council, such measures and regulations as may be deemed expedient to promote and encourage the introduction of free immigrants from abroad.

"Sec. 6. Such measures and regulations as shall from time to time be adopted by His Majesty the King in Privy Council under the provisions of this Act, shall be embodied in Ordinances of the King in Council; and the same shall be published in a newspaper published in Honolulu."

Session Laws of 1868, page 50, Sections 1, 2 and 3:

"Section 1. It shall be the duty of the Minister of the Interior, with the assistance of the Committee of Privy Council constituting the Board of Immigration, as soon as convenient after the passage of this Act, to devise and recommend for the adoption of His Majesty the King in Privy Council such rules and regulations as may be deemed necessary for the good government and control of immigrants that have been brought or admitted, or that may be brought or admitted into this Kingdom, as servants or laborers, under license or permission from the Bureau of Immigration, or contract with the Minister of the Interior.

"Sec. 2. Such rules and regulations as shall from time to time be adopted by His Majesty the King in Privy Council under the provisions of this Act, shall be embodied in Ordinances of the King in Council, and the same shall be published in a newspaper published in Honolulu.

"Sec. 3. All such ordinances shall specify the penalties for violation of the same, and shall have the force of law; and all Courts of justice shall take judicial notice thereof."

And an ordinance was passed on the 14th day of January last as it is said in pursuance of these statutes, of which the sections applicable to this case read as follows:

"Section 1.  On the arrival of any ship or vessel at any port of this Kingdom, having fifty or more immigrants on board seeking employment in this Kingdom, said immigrants shall not be landed from any such ship or vessel until permission to do so shall have been granted by the President or by an agent of the Board of Immigration.

"Sec. 2.  When such permission is obtained, the commanding officer of the vessel bringing said immigrants shall cause them to be landed at such place provided by the Board of Immigration as may be indicated by the Agent of the Board of Immigration as aforesaid.

"Sec. 4.  All immigrants landed in the place aforesaid shall be subject to the inspection of the Agent of the Board of Health, and to such orders as the Board of Health may make in the interests of the health of the immigrants or that of the public.

"Sec. 5.  Proper interpreters and facilities shall be afforded by the Board of Immigration to enable all such immigrants to make engagements for their services understandingly and fairly, and authority is hereby given to the Board of Immigration to prevent all unauthorized intrusions upon such immigrants, and to take such measures as may be conducive to the comfort, personal cleanliness and good order of such immigrants while residing in the said place provided.

"Sec. 6.  On the engagement of any such immigrants to labor made while at the place aforesaid, every employer shall pay a fee of five dollars for each immigrant engaged by him, which shall be applied by the Board of Immigration towards the expenses of the maintenance of the said place and of the immigrants therein.

"Sec. 7.  Immigrants not desiring to make engagements for labor shall, before leaving the depot, furnish to the President of the Board of Immigration satisfactory evidence that they will not become vagrants or a charge on the community for their support."

In the Matter of Chow Bick Git and Wong Kuen Leong.

It was made to appear at the hearing that these men have no money with them but are absolutely without the means of maintaining themselves, other than by the labor which they seek. Means and access have been given to all persons, seeking their labor to make bargains with them, interpreters have been supplied to them, and proper food and accommodations; and they are told and clearly made to understand that if they do not wish to engage on the terms offered to them, all they have to do in accordance with the 7th Article of the Ordinance, is to furnish satisfactory evidence that they will not become vagrants or a charge on the community, which they can do, by furnishing a bond of some person known to the President of the Board of Immigration, reasonably satisfactory. These petitioners, as I understand, refuse to accept employment on the terms offered to them by employers of labor, and likewise refuse to give the bond required and claim the right to enter the Kingdom unconditionally. It is a matter of public notoriety—such notoriety that the Court is obliged to take notice of it—that passengers similarly situated as these, by which I mean Chinese field laborers, seeking employment in this country, have lately arrived in extraordinary numbers. Nine ships have arrived here since December last, bringing 4,447 passengers, and it is said that one or two more ships are on the passage. The small-pox existed on board four of these ships at the time of their arrival. In point of fact, if these men were allowed to come on shore and mingle indiscriminately with the population, they could not be allowed under the quarantine regulations now in force to proceed from this port to the other islands, without undergoing fresh quarantine. The effect, therefore, would be to allow several thousand men to come ashore, not having the means of paying for their living, and quarter themselves on the town of Honolulu. To permit such a thing to take place would be rash in the extreme, and to

prevent it is clearly within the police authority of the country.

At the hearing in the former case it was contended that the ordinance in question is invalid because Article 1 in the Constitution declares the inalienable right of all men to life, liberty, and to the right of acquiring, possessing and protecting property.

Article 5.   That the writ of *habeas corpus* belongs to all men.

Article 9.   No person shall be deprived of life, liberty or property without due process of law.

Article 11 prohibits involuntary servitude except for crime.

Article 12 declares every person has the right to be secure from all unreasonable searches and seizures.

Article 14.   Each member of society has a right to be protected by it, in the enjoyment of his life, liberty and property.

This argument was abandoned, at the hearing of this case, and rightly so, for none of the provisions of the Constitution, which is a law between the Governors and the governed, or a compact between the citizens of a country as to how they shall be governed, will militate against the rights of that Government to prohibit or restrain foreigners, that is to say, people who are not members of the community, to enter into the territory.

"The Sovereign may forbid the entrance of his territory either to foreigners in general or to certain persons, or for certain particular purposes, according as he may think it advantageous to the State.   There is nothing in all this, that does not flow from the rights of domain and sovereignty; every one is obliged to pay respect to the prohibition."   Vattel, Law of Nations, Book 2d, Chapter 9, Section 94.

"Since the Lord of the territory may, whenever he thinks proper, prohibit it being entered, he has no doubt a power to annex what conditions he pleases to the permission."   Vattel, Book 2d, Chapter 8, Section 100.

In the Matter of Chow Bick Git and Wong Kuen Leong.

In the passenger cases, 7th Howard, all the Judges of the Supreme Court of the United States did not doubt the right of the general government to prohibit or restrain the entrance of immigrants into the country, and three of the Judges were of the opinion that the power had been reserved to the individual States. The majority of the Court were of the opinion that the authority in question had been surrendered to the general government, and therefore that the law of the State of Massachusetts, in this regard, was unconstitutional, as being in conflict with the rights of the federal government. Mr. Justice Woodbury, in that case, makes the following remark: "The conduct of the State, as a matter of right, is the only question to be decided by us, and may be a very different one from its expediency. Every sovereign State possesses the right to decide this matter for itself, provided it has the power to control or govern the subject. Our enquiry, therefore, relates merely to that power or right in a State; and the ground now under consideration, to support the exercise of it, is her authority to prescribe terms, in a police view, to the entry into her boundaries of persons who are likely to become chargeable as paupers, and who are aliens." It was justly said at the argument that the United States is as free a country as this, and yet they have very recently sought, by reviewing their treaty with China, to retake for themselves the right to regulate and restrain the advent of Chinese into their country. Now we have no treaty with China, and the provisions of our Constitution, which we have alluded to, are very similar to the provisions of the American Constitution.

But to pursue this line of argument further would seem superfluous, since it would be merely to refute the arguments which have been adduced to support a point which has been abandoned; but I cannot pass the subject by without alluding to the opinion of Chief Justice Allen *in re* Wong Sow on *habeas corpus*, 3d Haw. Rep., 518, with whose opinion in that case, I most fully concur: "If Wong Sow has a right to a

discharge, all on board under similar contracts have the same right, and six hundred people here, without means of support, might be a serious evil, not only in raising serious diplomatic questions, but in disturbing our domestic peace."

But it is said that the ordinance is without authority, because the Legislature has no right to delegate their authority to make laws to the Privy Council. This is true; but if we examine the Acts and the Ordinance together, we find no confusion of authority.

It is said that the ordinance in question is not in pursuance of this law. That it "would be a refinement of irony to say that such an ordinance is to promote and encourage the introduction of free emigrants." But it appears to me that there is no provision in this ordinance that is not in favor of the immigrants seeking labor. To provide a man or a body of men with suitable lodgings for a reasonable time, so that they may not be thrown ashore houseless and destitute, to become a prey to the designing, in a country whose language and law they do not understand—to provide them with interpreters and officers to see that they are not imposed upon, would seem to be an encouraging thing; nor can I see how their case would be made better by their being left to shift for themselves. It is said that they are obliged to take the wages offered and cannot seek for themselves. Certainly it would be the height of imprudence, in a police point of view, to allow a large body of men, ignorant of our language, to be ranging through the country on the pretense of seeking labor at higher rates than employers feel justified in giving. When the demand is in excess of the supply, wages rise; and when the supply is greater than the demand, wages fall; and to allow immigrants to come in and say, " We will not take work unless a higher rate of wages is given us than the circumstances warrant, and unless those wages are given we will not work at all," is to say that it is necessary to allow a horde of vagrants to take possession of the country, who must live by plunder or by begging.

In the Matter of Chow Bick Git and Wong Kuen Leong.

Certainly the first clause in the ordinance is not contrary to the rights of man; no one would claim that any community ought to be compelled to allow a quantity of people to land without inspection. The second likewise only designates the place where they may be landed. The third has nothing to do with the immigrants, but has only to do with the ship. The fourth no one can say is not reasonable, for it is made in the interests of the public health, and recent experience has demonstrated its utility and indeed its absolute necessity. The fifth has already been commented upon and shown to be for the protection of the immigrant; and the sixth is of the same nature; whilst the seventh provides that those not seeking labor shall give satisfactory evidence that they will not become vagrants or charges on the community. Certainly this is not onerous or unreasonable.

The sovereign authority has decreed in Legislative Assembly to the effect that the Bureau of Immigration shall superintend the introduction of immigrants (Session Laws of 1868, above quoted), and that the said Bureau of Immigration shall make rules and regulations to control immigrants that they may admit into the Kingdom as laborers (see Session Laws of 1868, above quoted), which seems to me equivalent to saying that those laborers may enter the country whom the Board of Immigration may permit so to do, and that the said Board of Immigration is authorized to make rules and regulations for their admission. The enactments are to the effect that such persons may enter the country upon these conditions and upon none other. It cannot be supposed that the Legislature can enter minutely into all the particulars which may render it expedient or necessary to exclude individuals from the country, or to delay or restrain their entry. Suppose, for instance, the police of a country had good reason to know that the persons sought to be introduced were of a turbulent and unruly character, and belonged, in fact, to the criminal classes, it would be singular indeed if they should be obliged to admit them to

In the Matter of Chow Bick Git and Wong Kuen Leong.

the manifest detriment of all the inhabitants of a country.

But it is said they are immured on the reef. This is a wrong application of terms. They are not immured at all; they are merely detained at the threshold until they shall comply with the reasonable rules which the master of the house makes for their entrance, and in the meantime they are at full liberty to go anywhere else they please.

The prayer of the petitioners is denied.

A. S. Hartwell for petitioners.

B. H. Austin for respondents.

Honolulu, March, 1881.

### BEFORE THE FULL COURT.

[Point by A. S. Hartwell, Esq.: The counsel for the petitioners freely admits the right of any independent nation, when not limited by treaty stipulations, to exclude any or all aliens from entering its territory, or to place restrictions upon the entry of foreigners; but contends that the ordinance in question does not exclude them, and that even if the statutes on which the ordinance is based is held to authorize the restriction of immigration, they do not authorize the making of an ordinance by which the punishment of imprisonment can be imposed upon persons who have once been admitted within the Kingdom.]

### OPINION OF CHIEF JUSTICE HARRIS.

I have listened to the arguments on the appeal and have duly weighed them, and see no reason for changing my opinion previously expressed.

Honolulu, April 25, 1881.

### OPINION OF MR. JUSTICE JUDD:

While fully agreeing with the conclusions arrived at by the learned Chief Justice in this case, I deem it proper to add this statement of my views. It is a well established principle

conceded by all jurists, that every independent State has, as an attribute of sovereignty, the right to altogether prohibit the entrance into its territory of strangers. Therefore treaties generally contain provisions conceding to the citizens of each contracting power the right to enter and reside in the territory of the other.

The fact that motives of policy have generally dictated that this right be not exercised, does not militate against the existence of the right.

*A fortiori*, then, the State has a right to impose such terms and conditions precedent to the entry of foreigners within its borders as in its opinion are essential to its welfare, peace and good government.

I see no reason why a sovereign State may not prescribe these terms, even in the absence of municipal law declaring what they shall be. The State may say to those who seek to become residents within its territory, "We will admit you, providing you accede to these terms which we deem to be reasonable and necessary." In the absence of law the State could not enforce these stipulations through its Courts, but if it possessed sufficient material strength, the naked right of the State to use the same to prevent the unauthorized and unwelcome entrance of foreigners is undoubted.

The right of a State as affecting the citizens of other States does not depend upon its own municipal law—the law only indicates and expresses the way in which these rights are to be exercised. The ordinance in the case before us does not create the right of this Kingdom to regulate and control immigration.

The first question is whether the ordinance possesses legal validity; if it does, then the power to restrain the petitioners from coming in among us as residents, until its provisions are complied with, must be sustained by the Court.

The objection is made that this ordinance is not made by the law-making power of this Kingdom, which by the Con-

stitution is vested in the Legislature, and that the Legislature cannot delegate this power to the Privy Council.

I do not see how the Acts of 1864 and 1868, empowering His Majesty in Privy Council, on the recommendation of the Board of Immigration, to make rules and regulations for the good government and control of immigrants, can be construed to be a delegation of legislative authority any more than the Acts empowering the Board of Health to make regulations respecting nuisance, interments of the dead and quarantine, or the Acts which authorize the Board of Education to adopt rules for the internal regulation and government of public schools, are delegations of the law-making power.

As regards the Board of Health, considering the variable nature of the circumstances affecting the public health from time to time, there must be lodged somewhere the authority to make regulations or ordinances suited to the special exigency as it arises, and to repeal them when the occasion no longer exists. The varying and often transitory nature of the difficulties to be met with in regard to immigration call with equal force for the creation of an authority to make such regulation as from time to time the necessities of the case require, and to repeal or modify the same as further developments may seem to demand.

If the contrary opinion should hold, the government would be obliged to await the meeting of the Legislature, which is convened only biennially, before a regulation could be made to meet circumstances easily conceived of, of a most pressing character, often to the health or safety of the citizens of this Kingdom.

Such regulations made by the various Boards and Department of this Government in pursuance of law, must not be inconsistent with any existing law or unreasonable or unjust.

But it is further objected that the ordinance in question is not authorized by the terms of the law, and particularly because the petitioners are not of the class or description of

In the Matter of Chow Bick Git and Wong Kuen Leong.

immigrants for the good government and control of which the Act of 1868 authorized ordinances to be made.

It must be borne in mind that the Act of 1864 already conferred the power on the Privy Council to "adopt such measures and regulations as may be deemed expedient to promote and encourage the introduction of free (that is, unindentured) immigrants from abroad," and the Act of 1868 extended these powers by making it the duty of the designated authority "to adopt such rules and regulations as may be deemed necessary for the good government and control of immigrants that have been brought or admitted, or that may be brought or admitted into this Kingdom as servants or laborers under license or permission from the Bureau of Immigration, or contract with the Minister of the Interior." These petitioners answer the description so far as they are immigrants brought or admitted here "as servants or laborers." They do not come "under contract with the Minister of the Interior," and it is said that they are not admitted under "license or permission from the Bureau of Immigration," and, therefore, the authority to make regulations for their good government and control does not exist. It is true that at the time when these laws were enacted, immigration from foreign countries was quite limited, and it mainly consisted of those who came under contracts or indentures made in their own country either with the Minister of the Interior or with private individuals, but as the Act of 1874 gave the general superintendence of the importation of foreign laborers and the introduction of immigrants to the Bureau of Immigration, and authorized the Board to adopt measures and regulations for the encouragement of free immigration, I think it is a fair inference to draw that all immigrants coming hither as servants or laborers come under the license or permission either express or implied of this Board. The fact that of late no express licenses or permission have been required to be taken out for the admission of immigrants does not prevent

In the Matter of Chow Bick Git and Wong Kuen Leong.

the Board of Immigration from now prescribing through this ordinance, upon what conditions their admission to this country may be permitted.

The ordinance is not repugnant to fundamental right, nor is it inconsistent with any law of this Kingdom, and it is in my opinion reasonable and easy to be complied with by all who it is likely will be a desirable class of residents for this country.

Honolulu, April 25, 1881.

OPINION OF MR. JUSTICE McCULLY.

Without writing an opinion at length argumentatively and with reference to authorities, in view of the full opinions filed by the Chief Justice and the First Associate, with which I agree, I hold—

1. That it is clearly of the sovereign right of a State to bar admission to its territory of the citizens of other States with whom it has no treaty stipulating otherwise, and that it is of the same right to make its own terms of admission if such shall be admitted.

2. That this Kingdom has delegated this right in respect to persons of the description of the immigrants by the Septima to the Board of Immigration, and that its ordinances are, therefore, legal and constitutional.

3. That the landing of these persons, under the conditions and circumstances and with the limitations previously made, was not for the purposes of this case, an admission within the Kingdom.

4. And that setting a guard to make the barring out effectual, to prevent their actual entry at large within this territory was not a restraint upon their liberty. In other words, that persons legally barred from entering the Kingdom, cannot be brought in by writ of *habeas corpus.*

Honolulu, April 25, 1881.