IN THE MATTER OF THE PETITION OF WONG TUCK, AH MUK, SEE YAN, AH KING, HEE PEE, and wife, AH SEE, KAI LIN, CHUN YEE (a woman), and her daughter LOK SAM, AH IN and wife, AH TAI alias AH FAI, CHEW SING, AH SEE (a woman), E. PONG, CHAN YIT MUNG, AH KONG, and LUM TUCK CHONG FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF LUKE KEW, MA NIN, MA SING, and CHOY PO FOR A WRIT OF HABEAS CORPUS.

IN THE MATTER OF THE PETITION OF LEONG CHEE, HEONG YOOK, YEN LIN, YEN CHONG, YEN YICK, YEN MOON, YEN BOW, and LU SEE FOR A WRIT OF HABEAS CORPUS.

ORIGINAL.

SUBMITTED DECEMBER 23, 1898.    DECIDED JANUARY 6, 1899.

JUDD, C.J., WHITING, J., AND CIRCUIT JUDGE PERRY, IN PLACE OF FREAR, J., ABSENT.

Every sovereign nation has the inherent right to deny to aliens the privilege of entering its territory and even to expel them therefrom.

It is also the right of every independent state to prescribe the conditions upon which it will admit aliens into its territory and further to revoke at will a permission or license already granted to an alien to enter, and this, too, without notice to such alien of its intention to thus revoke the license.

The Joint Resolution passed by the Congress of the United States on July 6, 1898, relating to the Annexation of the Hawaiian Islands, provided, inter alia, that "there shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States." *Held*, that by virtue of this provision the United States laws relating to the immigration and exclusion of Chinese were extended to and put in force in the Hawaiian Islands, and are now in force in this country; and, further, that Chinese, whether residing in this country or not prior to July 7, 1898, to whom permits to enter the Hawaiian Islands were issued prior to said date by the Hawaiian Government, are not excepted by the Resolution from the operation of said United States laws, but are also subject to the provisions thereof.

This Court is not a Court of the United States and has no jurisdiction, in habeas corpus proceedings or otherwise, to pass upon the validity of the appointment of a Federal officer or the extent of his powers under Federal laws or the legality of the detention by him under such laws of persons who claim to be illegally in such custody.

OPINION OF THE COURT BY CIRCUIT JUDGE PERRY.

Following are the pleadings in the case of Wong Tuck and others:

The petition of Wong Tuck, Ah Muck, See Yan, Ah King, Hee Pee and wife, Ah See, Kai Lin, Chun Yee and her daughter, Look Sam, Ah In and wife, Ah Tai alias Ah Fai, Chew Sing, Ah See, E. Pong, Chan Yit Mung, Aa Kong and Lum Tuck Chong respectfully represents as follows, to wit:

That on or about the ninth day of December, A. D. 1898, they arrived at Honolulu, Republic aforesaid, on the steamship "Gaelic" from China, and that each of said persons has complied with all the provisions of the laws of the Republic of Hawaii relating to Chinese immigration, and the regulations promulgated under said laws, and that they are and each of them is in every way qualified and entitled to land in the Hawaiian Islands.

That each of said persons is unlawfully detained on said steamship "Gaelic" lying at the Pacific Mail S. S. Company's

wharf in Honolulu, Island of Oahu, and is there restrained of his liberty by one Frank B. McStocker, Collector-General of Customs, at Honolulu, Island of Oahu; that said Frank B. McStocker has prohibited access to said persons by their friends and attorneys; and that he threatens to deport them from this country on said steamship "Gaelic" now in the port of Honolulu as aforesaid, and about to sail for San Francisco.

That your petitioners are informed and believe that the cause of the restraint of said persons is the alleged belief of said Frank B. McStocker, that the laws of the Republic of Hawaii relating to Chinese immigration are not in force and that they have been superseded by certain Acts of the Congress of the United States under which acts said persons are not qualified to land in these islands, all of which your petitioners deny.

Wherefore, petitioners pray that a Writ of Habeas Corpus may be granted, directed to the said Frank B. McStocker, commanding him to have the bodies of the above named Chinese persons so detained by said Frank B. McStocker before the Honorable A. F. Judd, Chief Justice of the said Court, at a time and place therein specified to do, receive and submit to what shall then and there be considered by the Court concerning them with this Writ, and that said persons may be restored to their liberty.

Dated at Honolulu, December 9, 1898.

(Signed)                                        R. D. SILLIMAN,

In behalf of the above named petitioners, and sworn to by him.

## WRIT.

*In the name of the Republic of Hawaii:*
        *To Frank B. McStocker, Greeting:*

We command that upon receipt of this Writ you have and produce before the Honorable A. F. Judd, Chief Justice of the Supreme Court at his Chambers, Aliiolani Hale, Honolulu, at 10 o'clock a. m. on Monday, December 12th, 1898, the bodies of Wong Tuck, Ah Muk, See Yan, Ah King, Hee Pee and his

wife, Ah See, Kai Lin, Chun Yee (a woman), and her daughter, Lok Sam, Ah In and his wife, Ah Tai otherwise known as Ah Fai, Ah See ( a woman), E. Pong, Chan Yit Mung, Ah Kong and Lum Tuck Chong, who, it is alleged, are unjustly imprisoned and restrained of their liberty, to do and receive what shall then and there be considered concerning them in this behalf.

And have you there this Writ with your doings thereon.

Witness the Honorable A. F. Judd, &c.

RETURN.

Now comes F. B. McStocker, Collector-General of Customs of the Hawaiian Islands, and, for return to the Writ served upon him herein, respectfully shows to this Honorable Court as follows:

That persons answering to the names of the petitioners set forth in the petition filed herein, all of whom are Chinese subjects, arrived at the port of Honolulu on the steamship "Gaelic" from ports in China, on or about the 9th day of December, A. D. 1898.

That upon the arrival of the petitioners they were removed to the quarantine station at Mauliola, for the purpose of performing quarantine duties and were subjected to the inspection of the Collector-General of Customs aforesaid and of J. K. Brown, United States Chinese Inspector.

That upon such examination it was ascertained that certain of said petitioners, namely: Kai Lin, Chun Yee, Lok Sam, Chew Sing and Ah See were qualified, under the laws of the United States to enter the Hawaiian Islands, and were thereupon allowed so to enter and are not in the custody of the respondent or of said J. K. Brown.

And it was ascertained that certain of said petitioners, to wit: Ah Muk, See Yam, Hee Pee and wife, Ah In, wife and son, E. Pong, Chan Yit Ming and Lum Tuck Chong are laborers; and certain others of them, to wit: Wong Tuck, Ah King,

and Ah Tai alias Ah Fai are merchants; and the petitioner Ah Kong is a traveler, and that none of them had complied with the provisions and requirements of the Treaty existing between the United States and the Empire of China, nor of the United States Statutes, nor of the regulations of the United States Treasury Department respecting the exclusion of Chinese.

Wherefore, it was decided by the respondent as Collector-General of Customs as aforesaid and the said J. K. Brown, United States Chinese Inspector as aforesaid, that said petitioners, each and all of them, were not entitled to enter the Hawaiian Islands, and that they should be held to await the arrival of a steamer returning to China that they might be deported.

In accordance with which decision the said Ah Muk, See Yan, Hee Pee and wife, Ah In, wife and child, E. Pong, Chan Yit Ming, Lum Tuck Chong, Wong Tuck, Ah King, Ah Tai, alias Ah Fai and Ah Kong are held in the custody of the respondent as Collector-General of Customs as aforesaid, and of said J. K. Brown, United States Chinese Inspector as aforesaid, and the respondent here brings them and each of them before this Honorable Court as in said Writ directed.

And the respondent for further return to the said Writ respectfully shows to this Honorable Court that upon the inspection aforesaid he ascertained that See Yan, Ah King and Ah Kong, petitioners above named had not qualified under the laws of the Republic of Hawaii to enter the Hawaiian Islands.

Honolulu, H. I., December 17, 1898.

(Signed)                    F. B. McStocker,
                         And sworn to by him.

REPLICATION TO RETURN.

Now comes the petitioners above named by their attorneys, and in reply to the return of said F. B. McStocker, to their petition, say:

That Kai Lin, Chun Yee, Lok Sam, Chew Sing and Ah See, admit that they have been allowed to enter the Hawaiian Isl-

ands and are not now in the custody of said F. B. McStocker, and therefore withdraw their names from this replication.

The petitioners, Ah Muk, See Yan, Hee Pee and wife, Ah In, wife and son, E. Pong, Chan Yit Ming, Lum Tuck Chong, Ah King, Ah Tai, alias Ah Fai, and Ah Kong, being all of the other petitioners respectfully allege, that neither the United States Statutes relating to the immigration of Chinese into the United States, nor the regulations of the United States Treasury Department respecting the exclusion of Chinese, nor the Treaty between the United States and the Empire of China, have any operative force within the Republic of Hawaii, and neither the said F. B. McStocker, nor said J. K. Brown, named in said return, have any authority to enforce said statutes and regulations, nor the provisions and requirements of the Treaty existing between the United States and the Empire of China, nor have they any legal authority to restrain said petitioners of their liberty.

And the petitioners, Ah Muk, Hee Pee and wife, Ah In, wife and son, E. Pong, Chan Yit Ming, Lum Tuck Chong, Wong Tuck, Ah Tai, alias Ah Fai, allege that they are not immigrants within the meaning of the Resolution of the United States of America annexing the Republic of Hawaii to the said United States, approved by the President of the United States on July 7th, 1898, but each of said persons alleges that he was prior to the 7th day of July, 1898, a resident duly domiciled within the Republic of Hawaii, but prior to said day departed therefrom for the Empire of China and previous to said departure obtained from the Government of said Republic Certificates of Permission to go to said Empire of China and to return again to the Republic of Hawaii.

And in pursuance of said intention and in compliance with said Certificates of Permission the said petitioners departed from said Republic, and on said 9th day of December, 1898, in compliance with said intention and said Permission, returned again to said Republic of Hawaii, whereupon he was taken into

the custody of said defendant without jurisdiction or authority of law.

Petitioners See Yan, Ah King, and Ah Kong, allege that prior to the 7th day of July, 1898, they received from the Consul of the Republic of Hawaii, stationed at the port of ........ in the Empire of China, and duly authorized to act as said Consul for said Republic at said port, Certificates of Permission to enter the Republic of Hawaii, which said Certificates of Permission were therefore, on or about the 13th day of June, 1898, duly issued for them by the Government of the Republic of Hawaii in accordance with the laws of said Republic, and duly delivered as aforesaid prior to the 7th day of July, 1898, by said Consul:

And in compliance with said Permission, and without notice or knowledge of any withdrawal of said permission or change in the laws of the Republic of Hawaii took passage by the said steamship "Gaelic" for said port of Honolulu.

And said petitioners, See Yan, Ah King,, and Ah Kong, further allege that the sole cause of their detention by said defendant is that they have not executed a bond upon their arrival as required by the laws of the Republic of Hawaii, and your petitioners allege that the law requiring the execution of said bond was annulled and revoked by the passage and approval of said Resolution of the United States of America annexing said Hawaiian Islands to the said United States of America.

And further your petitioners allege that said defendant has refused to permit any person wishing to become surety upon the bond of said See Yan, Ah King, and Ah Kong to have access to said petitioners, and has refused to accept any bond, and petitioners say that they are ready, willing and able to furnish the said bond, or any other bond that may be required of them by law.

Wherefore, petitioners pray that they may be discharged from the defendants' custody.

Signed by petitioners' counsel.

In the matter of the petition of Luk Kew, et al., the allegations and the Writ are similar to those of the first case, and the return and replication thereto are as follows:

RETURN.

Now comes F. B. McStocker, Collector-General of Customs of the Hawaiian Islands, and for return to the Writ served upon him herein respectfully shows to this Honorable Court as follows:

The persons answering to the names set forth in said petition and in said Writ were in the custody of himself, as Collector-General as aforesaid and J. K. Brown, United States Chinese Inspector at the times alleged therein; and he here brings them and each of them before this Honorable Court as in said Writ directed; and he hereby shows the cause of the detention of said petitioners as follows:

1. That all of said petitioners are Chinese laborers who arrived at the port of Honolulu, Hawaiian Islands, on or about the fourth day of December, A. D. 1898, on the steamship "City of Peking."

2. That upon arrival of the petitioners they were removed to the quarantine station at Mauliola for the purpose of performing quarantine duties, and were subjected to the inspection of the respondent as Collector-General of Customs as aforesaid and of the said J. K. Brown, United States Inspector as aforesaid.

That upon such inspection it was ascertained that none of them had complied with the provisions and requirements of the Treaty existing between the United States and the Empire of China, nor of the United States Statutes relating to the immigration of Chinese into the United States, nor of the regulations of the United States Treasury Department respecting the exclusion of Chinese.

Wherefore it was decided by the respondent as Collector-General as aforesaid and the said J. K. Brown, United States In-

spector as aforesaid, that said petitioners, each and all of them, were not entitled to enter the Hawaiian Islands; and that they should be held to await the arrival of a steamer returning to China that they might be deported.

And the respondent for further return to the said Writ respectfully shows to this Honorable Court that upon the inspection aforesaid he ascertained that Luke Kew, Ma Nin and Ma Sing, petitioners above named had not qualified under the laws of the Republic of Hawaii to enter the Hawaiian Islands.

Honolulu, December 17, 1898.

(Signed)                              F. B. McStocker,
                                      And sworn to by him.

### REPLICATION TO RETURN.

Now come the above named petitioners, by their attorneys, J. Alfred Magoon, and R. D. Silliman, and in reply to the Return of said F. B. McStocker, to their said petition, say:

That neither the United States Statutes relating to the immigration of Chinese into the United States, nor the Regulations of the United States Treasury Department respecting the exclusion of Chinese, nor the provisions and requirements of the Treaty between the United States and the Empire of China, have any operative force within the Republic of Hawaii, and that neither said F. B. McStocker nor J. K. Brown have any authority to enforce said Statutes, Regulations or Treaty within the Republic of Hawaii, nor have they or either of them any legal authority to restrain petitioners of their liberty.

That the petitioner Choy Po is not an immigrant into the Republic of Hawaii, but was prior to July 7, 1898, a bona fide resident of the Republic of Hawaii, and prior to said day received from the Government of the Republic of Hawaii permission to return to China and again re-enter the Hawaiian Islands, wherein he at that time had and still has, his home and domicile.

And the petitioners Luke Kew, Ma Nin and Ma Sing, allege that they received from the Consul of the Republic of Hawaii

for the port of .........., in the Empire of China, and duly qualified to act as such Consul at such port of said Empire of China, Certificates of Permission to enter said Republic of Hawaii, which Certificates were theretofore and on or about the 13th day of June, 1898, duly issued by the Government of the Republic of Hawaii, for the use of your petitioners, and which Certificates were delivered to your petitioners before the 7th day of July, 1898, by said Consul.

And said petitioners Luke Kew, Ma Nin and Ma Sing further allege that they have fully qualified under the laws of the Republic of Hawaii existing prior to said 7th day of July, 1898; That said F. B. McStocker restrained their entering into these islands for the reason that they have not made a Bond required of them upon their landing in said Hawaiian Islands by the laws of this Republic prior to July 7, 1898; but your petitioners allege that said law requiring said Bond was repealed by the Joint Resolution of the United States Congress approved by the President on said day.

Your petitioners further allege that they have requested permission to execute a bond as was required by said laws of the Republic of Hawaii prior to said 7th day of July, 1898; but that said F. B. McStocker has refused to permit them so to do, and has refused to allow any persons who are willing to become sureties for your petitioners to confer with your petitioners; And your petitioners allege that they have complied with all the laws and all the requirements of the Republic of Hawaii that were in force on the day of their arrival at the port of Honolulu; That said Permits and Certificates have never been revoked or cancelled, and are still in full force and effect. and that said Annexation of said Republic of Hawaii to the United States of America did not, and was not intended to have any retrospective operation.

Dated at Honolulu, Oahu, December 19, 1898.

Signed by petitioners' counsel.

In the matter of the petition of Leong Chee, et al., the allegations and the Writ are similar to those in the first case, and the return and replication thereto are as follows:

## RETURN.

And now comes Frank B. McStocker, Collector-General of Customs of the Hawaiian Islands, and Joshua K. Brown, and for return to the Writ served upon them in the above entitled cause, respectfully show to this Honorable Court as follows:

That they admit that the said petitioners are citizens of the Chinese Empire, and that on or about the 9th day of December, 1898, they arrived at the port of Honolulu, Hawaiian Islands, on the steamer "Gaelic" from China.

That they deny that the said petitioners are unlawfully imprisoned and restrained of their liberty at the Quarantine Station, Honolulu, Hawaiian Islands, by them, the said Frank B. McStocker and Joshua K. Brown, or either of them; and say that the said petitioners are detained at said station only in so far as they are thereby prevented from entering this country, for the reasons hereinafter set forth; and that said prevention from entering is lawful and that in pursuance with the order of said Writ the said petitioners are herewith produced in Court.

That they charge that all laws of the United States of America relating to and having a bearing upon the immigration of Chinese into the United States have been extended to and are now a part of the law as well of Hawaii as of every other part of the United States, governing the immigration of Chinese into Hawaii;

That under said laws of the United States of America, the Secretary of the Treasury of the said United States of America is charged with the execution of said laws, with power to appoint subordinate officers and inspectors for such purpose;

That in pursuance of said power, the said Secretary of the Treasury did, prior to the 9th day of December, 1898, duly appoint and detail the said Joshua K. Brown as United States

Immigration Inspector to superintend the enforcement and execution of the said laws in Hawaii, and has directed that Collectors of Customs in said Hawaii shall act in conjunction with him and assist in the execution of said laws; and on said 9th day of December the said Joshua K. Brown was acting as said Inspector at said Honolulu;

That said laws of the United States of America prescribe certain acts and conditions, more fully appearing in said laws, to be performed or complied with by Chinese citizens, or to exist, before they can enter the United States, including the said territory of Hawaii, which acts the petitioners have failed to perform, or comply with, and which conditions they have failed to show exist;

That by reason of said failure of said petitioners to perform said acts or comply with said conditions, prescribed by said laws of the United States, they are not entitled to enter either the said port of Honolulu or any other port in the United States.

That the said petitioners have not been landed in Hawaii, otherwise than temporarily for the purpose only of inspection as to their right to enter the country, and are not, therefore, within this country so far as to give this Court jurisdiction to entertain their said petition; and the said Frank B. McStocker, Collector as aforesaid, and Joshua K. Brown, Inspector as aforesaid, therefore claim that this Court has no jurisdiction to entertain the said petition.

And the said Frank B. McStocker, Collector as aforesaid, and Joshua K. Brown, Inspector as aforesaid, further present to the Court that by the terms of the said laws of the United States of America, there is vested in the executive officers of the United States Government the sole and final decision upon the right of any Chinese to admission to any port of the United States, with no appeal from such decision to any Court, and with no right of review in any Court;

That in pursuance with the said orders of the said Secretary of the Treasury, the said Frank B. McStocker, Collector of

Customs as aforesaid, and Joshua K. Brown, Inspector as afore-said, have, and each of them has, examined the said petitioners and all matters and things appertaining thereto bearing upon their right to enter the port of Honolulu, and have, and each of them has, decided that the petitioners, and each of them, are not entitled under the said laws of the United States to enter the said port;

That the said Frank B. McStocker, Collector as aforesaid, and Joshua K. Brown, Inspector as aforesaid, therefore claim that they having so decided that under the terms of said laws of the United States, said petitioners have no right to admission to the said port, this Court has no jurisdiction to entertain the said petition, or to consider the question of whether or not the said petitioners are entitled to enter said port of Honolulu, or any other question appertaining thereto;

And the said Frank B. McStocker, Collector as aforesaid, and Joshua K. Brown, Inspector as aforesaid, further present that the question of whether or not the said petitioners are entitled to enter into the said port of Honolulu is purely a federal question involving the construction of an Act of Congress of a pure-ly federal character cognizable only in a Federal Court of the United States, and not cognizable in the Courts of any State or Territory;

That this Honorable Court is not a Federal Court of the Uni-ted States, and therefore has no jurisdiction to entertain said petition or to attempt to construe or apply the said law of the United States, or otherwise pass upon the same.

Honolulu, December 19, 1898.

(Signed)                              F. B. McStocker,
(Signed)                              Joshua K. Brown.
                                      And sworn to by them.

### Replication to Return.

"And now come petitioners named in the Writ issued herein and for replication to said return deny that the Supreme Court

of the Republic of Hawaii has not jurisdiction to entertain the said petition.

Deny that no right of review exists in said Court over the acts of said Joshua K. Brown and Frank B. McStocker.

Aver that this Court has jurisdiction to entertain the said petition, and to consider the question of whether or not said petitioners are entitled to enter the port of Honolulu, and other questions appertaining thereto.

Deny that the laws of the United States have been extended to the Hawaiian Islands in so far as they govern the immigration of the Chinese into Hawaii.

Deny the authority of said McStocker and Brown therein averred."

Signed by petitioners' counsel.

The following documents were filed in relation to the appointment of J. K. Brown as Chinese Inspector to enforce the provisions of the Chinese exclusion acts. Other documents were also filed relating to his duties and his instructions:

"Division of Appointments. Treasury Department,

Office of the Secretary,

Washington, D. C., May 20, 1897.

*Mr. Joshua K. Brown, No. 578 Oak St., Columbus, Ohio:*

SIR:—You are hereby reinstated as an official of this Department and appointed as an Inspector to enforce the provisions of the Chinese Exclusion Acts, with compensation at ........ the appointment to take effect from date of oath.

You will report in writing to the Supervising Special Agent of this Department for instructions and assignment to duty.

Respectfully yours,

O. L. SPAULDING,

Acting Secretary."

"Treasury Department,
Office of the Secretary,

Washington, D. C., Nov. 3, 1898.

*Mr. Joshua K. Brown, Chinese Inspector, Detroit, Mich.:*

SIR:—You are directed to proceed to Honolulu, Hawaiian Islands, as soon as practicable after the receipt of this letter, and to co-operate with the Customs officials of those islands in the enforcement of the laws and treaty between the United States and China, and the regulations of this department respecting the exclusion of Chinese, the same having been held by the Attorney-General to be now applicable to the Hawaiian Islands.

You are informed that specific instructions have been transmitted to the Customs officials of those islands, through the Honorable Secretary of State and Special Agent Harold M. Sewall, at Honolulu, and a copy of such instructions is herewith transmitted for your information and guidance.

As soon as practicable after you arrive at the Hawaiian Islands you should ascertain and report the number of Chinese of each class now in the Hawaiian Islands; and also at what ports in those islands, and in what numbers, Chinese arrive, and you should visit such ports and confer fully with the Customs officers located there touching the operations of the Chinese exclusion laws and treaty. You should make full report from time to time upon this subject, and especially of any irregularities on the part of local officers, or of Chinese seeking admission to the Hawaiian Islands by irregular means.

To enable the Collector of Customs in those islands to comply with the instruction contained in Department letter of this date to the Secretary of State, providing for the identification of Chinese laborers who may wish to depart from the Hawaiian Islands with the privilege of returning thereto, blank forms of Chinese laborer certificates numbered 8301 to 8500, inclusive, are herewith transmitted, and you are directed to place them in

the hands of the proper Collectors in those islands and to instruct them in their use.

Until further notice you may include in your pay accounts your actual and necessary expenses incurred while stationed in the Hawaiian Islands.

Department letter of the 8th ultimo, directing you to report for instructions and assignment to duty to the Collector of Customs at San Francisco, California, and making that port your official station, is hereby revoked. You should be prepared to start on your journey to that place not later than the 10th inst.                              Respectfully yours,

W. B. HOWELL,
Assistant Secretary."

By the Court.

The record thus shows that some of the petitioners resided in these islands prior to July 7, 1898, and left with the intention of returning and possessing permits to re-enter, issued prior to said date and that the others of the petitioners have not heretofore resided in this country but also possess permits to enter issued prior to said date.

The main issue raised by the pleadings is whether or not the laws of the United States relating to the immigration and exclusion of Chinese were extended to the Hawaiian Islands by the terms of the Joint Resolution passed by Congress on July 6, 1898, and signed by the President on the day following, and commonly called the "Newlands Resolution."

Before entering upon the consideration of the question of what it is that Congress has enacted by that Section of the Newland's Resolution which refers to Chinese immigration, it is well to observe the extent of the powers possessed by Congress in the matter of the exclusion and expulsion of foreigners.

It is a fundamental principle that every sovereign nation has the inherent right to deny to aliens the privilege of entering its territory and even to expel them therefrom. This principle has been recognized and affirmed in clear and unmistakeable lan-

guage by the Supreme Court of the United States. In *Chae Chan Ping v. United States*, 130 United States 606, 607, the Court said: "The power of the government to exclude foreigners from the country whenever, in its judgment, the public interests require such exclusion, has been asserted in repeated instances, and never denied by the executive or legislative departments," and quoted with approval the language of United States executive officials, who wrote, "Every society possesses the un-doubted right to determine who shall compose its members, and it is exercised by all nations, both in peace and in war.    *    * It may be always questionable whether a resort to this power is warranted by the circumstances, or what department of the government is empowered to exert it; but there can be no doubt that it is possessed by all nations, and that each may decide for itself when the occasion arises demanding its exercise."    *    *    * "The control of people within its limits, and the right to expel from its territory persons who are dangerous to the peace of the State, are too clearly within the essential attributes of sov-ereignty to be seriously contested."    Again, in the case of *Nishimura Ekiu*, 142 United States 659, this language is used: "It is an accepted maxim of international law, that every sov-ereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."

"The right of a nation to expel or deport foreigners, who have not been naturalized or taken any steps toward becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified as the right to prohibit and prevent their en-trance into the country."—*Fong Yue Ting v. United States*, 149 United States 707.  See also *Lem Moon Sing v. United States*, 158 United States 538, in which these decisions are re-affirmed.

This Court also, in the case of *Chow Bick Git* and another, 4 Haw. 385, recognized this principle.

It is also the right of every independent state to prescribe the conditions upon which it will admit aliens into its territory, and further to revoke at will a permission or license already granted to an alien to enter, and this, too, without notice to such alien of its intention to thus revoke the license. This is conceded by all who took part in the argument in the case at bar.

Being possessed, then, of these ample powers and knowing, as we must presume, what the laws of Hawaii were on the subject of Chinese immigration, the United States, through Congress, its duly constituted mouth-piece, on the sixth of July last ordered that "there shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States." The Republic of Hawaii has accepted and acquiesced in that and the other provisions of the Newland's Resolution. What is the true meaning and effect of that paragraph of the Resolution?

In the first place, I am of the opinion that in the use of the term "immigration" Congress did not intend to limit the application of the prohibition to such persons as can be called "immigrants" within the popular acceptation of that term, and to exclude from its operation those aliens who, having formerly resided in the country and having left with the intention of returning, seek to re-enter after such temporary absence; but rather that it was the intention to prohibit, to the extent stated in the Resolution, the further "coming in" of Chinese, whether they had formerly resided in the country or not. I construe the first clause of the paragraph in question as being the equivalent of "Hereafter no Chinese shall be allowed to enter the Hawaiian Islands."

*In re Panzara et al.*, 51 Fed. 275, and *In re Martorelli*, 63 Fed. 437, are cited in support of the contention that the narrower signification should be given to the term "immigration." Those cases seem to me not to be in point. The Court in each of them was construing the statutes relating to the immigration

of aliens other than Chinese, in which statutes the words "immigrants" and "alien immigrants" were used in describing the classes intended to be excluded. Those precise terms are not used either in the Resolution or in the United States laws relating to Chinese. The Statutes and the reasons for their enactment were not the same as those now before the Court. Moreover, the decisions of the United States Supreme Court show that under existing legislation in regard to the exclusion of Chinese, applicants for admission are not exempt from the operation of such legislation solely by reason of the fact that they have resided in the United States and left with the intention of returning. See *Lem Moon Sing v. United States*, 158 United States 538. In other words, the prohibition against entrance may apply to those returning after a temporary absence as well as to those who are strictly "immigrants," if that appears to be the intention of Congress; and in this instance, I believe that the intention was to use the term in the broader signification.

The contention on behalf of the petitioners is that this provision of the Resolution does not apply to those Chinese to whom permits were issued according to Hawaiian laws, by the Hawaiian Government, prior to the passage of the Resolution, because to hold to the contrary would be to give to the provision a retrospective operation, and that this would be in this instance a violation of the rule of construction that a law shall be given prospective operation only unless the intent is clear to give it retrospective force; further that to hold that the provision applies to petitioners would cause great injustice and oppression because petitioners have come here in good faith on the strength of permits issued as above stated and without notice of the repeal of Hawaiian laws.

If Congress had simply said, "There shall be no further immigration of Chinese into the Hawaiian Islands," or, what is its equivalent, "Hereafter no Chinese shall be allowed to enter the Hawaiian Islands," it seems to me that there could be no

possible room to doubt but that the provision would prevent any and all Chinese from entering the Hawaiian Islands, whether former residents or not and whether or not possessed of a Hawaiian permit to enter issued prior to July 7, 1898. Such language though very brief, would be clear and explicit, and would not admit of the construction into it of any exception. And *that* is the language used in the Resolution, with this difference and this only, to wit, "except upon such conditions as are now or may hereafter be allowed by the laws of the United States." Congress has in these words stated one exception by virtue of which certain Chinese may hereafter enter these islands. To say that such Chinese as possess Hawaiian permits issued prior to July 7, 1898, shall also be exempt and be allowed to enter, seems to me to be to add another exception to the prohibition and one which Congress did not see fit to make. Where the language used by the legislative body is clear and explicit, and the enactment is one within its power,—and in this case I think that is so—it is for the Court to enforce it even though its members might, for considerations of injustice and hardship, have refused to so legislate were it within their province to do so.

The Hawaiian laws in force just prior to the passage of the Resolution, authorized the Government to issue permits to Chinese to enter these islands in three classes of cases: first, to those who residing here wished to leave the country temporarily and return within a year; second, to merchants and travellers, who had never been in the country before, but wished to sojourn here temporarily, the limit of such sojourn being fixed at six months; and third, to laborers, who, also, had never been in the country before, and who were permitted to remain in the country for an indefinite period upon condition only that they confine themselves while here to certain specified occupations. A bond was required in the second class, conditioned that the principal would leave the country at or before the expiration of the six months, and in the third class conditioned for the faithful performance of the undertaking as to occupation. See

Penal Laws of 1897, p. 504 *et seq.* Had the Hawaiian Government issued, shortly before July 7, 1898, (and this Court does not know whether it did or not) permits for a large number of Chinese of the third class, it could not be successfully contended, as I believe, that it was not the intention of Congress to revoke all such permits and to prevent their holders from entering these islands. Other matters were, by the terms of the Resolution, expressly continued as then existing, until Congress should otherwise provide; but it is apparent that, in view of the policy of the United States with reference to Chinese, Congress wished to put an end at once to the entry of Chinese into these islands under any conditions other than those prescribed by United States laws. And if it was the intention of Congress to exclude laborers of the third class above mentioned how can it be held that it was not its intention to so exclude those of either the first or second class or of both those classes? It is the fact that they hold permits, if anything at all, which would give them the right to enter, and yet all three classes alike hold such permits. It is not the fact of justice or injustice which would give them the right to land, for those are considerations which it is for the law-making power, and not for the Court, to weigh. Uncertainty in the law would be the result if the Court were to determine each applicant's right to land upon the existence or non-existence of injustice or hardship.

There is no doubt that the rule in the United States is that "in construing statutes so worded as to admit of a construction which would render them retrospective as well as prospective, a prospective operation only is to be given, unless a legislative intent to the contrary is declared, or necessarily implied from the circumstances of the language used."—23 Am. and Eng. Encycl. Law, p. 448. In this case, the legislative intent is to be gathered from the language used in the Resolution itself, and Congress having said that there should be *no* further immigration of Chinese into these islands except as therein stated, it must be presumed that that body meant what it said without any further qualifications. If any injustice or hardship results

from their act, the responsibility therefor is upon the law-makers and not upon this Court.

It is true, I think, that the *deportation* of those Chinese, if any, unlawfully in the Hawaiian Islands, cannot for the present be enforced, because the statutes require that certain proceedings be had before a United States Judge in order to establish the unlawfulness of their presence, and no such tribunal as yet exists here. But it does not follow that because this is so Congress did not intend that the provisions of United States laws relating to the *exclusion* of those not yet in the country should take immediate effect. It may well have been the fact, and I think that it was, that Congress, while willing to allow those in the country unlawfully to remain until further order, was anxious to put an end at once to any further influx.

Under the terms of the Resolution, when a Chinese person seeks to enter the Hawaiian Islands, the question of whether or not he is entitled to enter is to be determined in accordance with the United States laws, in other words, the United States laws relating to the immigration and exclusion of Chinese are now the rule of action here, are in force here, and apply in my opinion to *all* Chinese who seek to enter.

It is argued that no machinery has been provided by Congress for the enforcement of the United States Chinese exclusion laws in these islands and that consequently it could not have been the intention of Congress to make said laws applicable in the cases of those Chinese who hold return permits issued prior to July 7, 1898. Assuming that it is true that there is no machinery as claimed, the objection, if it is good so far as to lead the Court to hold that it was not the intention to give the Resolution a retrospective operation, must also of necessity compel the Court to hold that not even prospective operation can be given to it until Congress shall by further legislation provide the means for enforcing the laws. The only logical conclusion of the argument is, it seems to me, that until such time United States laws do not apply here and that Hawaiian laws continue in force. Yet, that the Hawaiian statutes so far

as they are inconsistent with United States laws on the subject are repealed by the Resolution and that the United States laws are, prospectively, at least, extended is clear. Moreover, the necessary conclusion as just stated would render the clause in the Resolution inoperative and meaningless. If Congress had simply intended to leave matters as they stood with reference to Chinese immigration until it should further legislate, the clause would have been omitted; the general provision continuing existing laws in force would have been amply sufficient.

The various United States Statutes on the subjects of Chinese immigration and immigration of other aliens, are not as clear in their language as they might be in defining the relative powers and duties, in the premises, of Collectors of Customs and of Chinese Inspectors appointed by the Secretary of the Treasury. Both are given certain powers to exercise and certain duties to perform, and between them can fully enforce all Chinese exclusion laws, but just where the dividing line between them is, just what an Inspector can do without the assistance of a Collector, it is more difficult to define. Another question not free from difficulty is whether the Collector of Customs of the Hawaiian Islands is authorized to perform the various duties assigned to Collectors by the United States Chinese Exclusion Laws, these islands not having yet been made a Collection District of the United States.

Under the latest Hawaiian laws on the subject, the Collector-General of Customs is vested with the power to decide whether or not an alien applying for admission is entitled to enter these islands. The Newland's Resolution provides that "until Congress shall provide for the government of such islands all the civil, judicial and military powers exercised by the officers of the existing government in said islands, shall be vested in such person or persons, and shall be exercised in such manner as the President of the United States shall direct, and the President shall have power to remove said officers and fill the vacancies so occasioned; and, in another section, that "the municipal legislation of the Hawaiian Islands, not enacted for the fulfill-

ment of the treaties so extinguished and not inconsistent with this joint resolution, nor contrary to the Constitution of the United States, nor to any existing treaty of the United States shall remain in force until Congress of the United States shall otherwise determine." By virtue of this latter provision, those Hawaiian Statutes or parts of statutes relating to Chinese immigration which are not inconsistent with or help along the United States laws on the same subject continue in force even after an extension of such United States laws to these islands, and there seems to be strong ground for the proposition advanced by one of the attorneys who took part in the argument that respondent McStocker, as Collector-General of Customs of the Hawaiian Islands, is vested with power to enforce the exclusion of Chinese if in fact United States laws have been extended here. In view, however, of my conclusion, stated later on, on the subject of jurisdiction, I deem it unnecessary to decide this question now.

With reference to the authority of respondent J. K. Brown, Chinese Inspector: The Act of August 3, 1882, relating to the immigration of aliens (1 Supplement to Revised Statutes p. 370) charges the Secretary of the Treasury with the duty of executing the provisions of that act "*and* with supervising the business of immigration to the United States." This last clause gives that official the authority to supervise *all* immigration to the United States which would include the immigration of Chinese. If the clause last cited were construed to apply only to such immigration as is mentioned in that Act, to wit, of paupers and other undesirable persons, the clause would be useless repetition. In various appropriation bills passed within the last few years and up to the present time, certain sums of money have been appropriated, under the title of the Treasury Department, in the language: "Enforcement of the Chinese Exclusion Act: To prevent unlawful entry of Chinese into the United States by the appointment of suitable officers to enforce the laws in relation thereto, and for expenses of returning to China all Chinese persons found to be unlawfully in the United

States.   *   *   *   and for enforcing the provisions of the Act
approved May 5th, 1892, entitled "An Act to prohibit the com-
ing of Chinese persons into the United States," ............
Dollars.  These statutes seem, prima facie, to give to the Secre-
tary of the Treasury authority to appoint Chinese Inspectors
and to the inspectors so appointed authority, not simply to ad-
vise the Collectors as to their duties under the Chinese Exclu-
sion Acts, but to act themselves and reject and exclude Chinese
applicants for admission.

In *Williams v. The United States,* 168 United States 387,
388, the Court held that the plaintiff in error "in his capacity
of Chinese Inspector," under appointment by the Secretary of
the Treasury, "did not act under any law that could properly
be regarded as a revenue law," but that "he was appointed pur-
suant to Acts of Congress appropriating money to be used by the
Treasury Department to prevent unlawful entry of Chinese
into the United States, by the appointment of suitable officers
to enforce the laws in relation thereto.   *   *   *   The Chi-
nese Exclusion Acts have no reference to the subject of reve-
nue, but are designed to exclude persons of a particular race
from the territory of the United States.  Clearly, Chinese In-
spectors, proceeding under the Acts providing for their ap-
pointment, have no connection with the revenue system of the
government, although the execution of the acts referred to is
committed to the Treasury Department."

It is far from clear, then, that the necessary machinery does
not exist here for the enforcement of United States laws rela-
ting to the immigration and exclusion of Chinese.  But wheth-
er it does or not, the language of the Resolution, as I have
already stated, clearly shows that Congress did not intend that
the rule of action in regard to Chinese immigration into these
islands should continue as it was, but did intend that United
States laws should without delay take the place of the Hawai-
ian laws so far as the two were inconsistent.

The argument that the provision of the Resolution under
consideration is simply in the nature of an organic act, intended

as a direction to or limitation upon the powers of Congress and of the Hawaiian Legislature hereafter, does not seem to me to be sound. It is open to the objection already mentioned of rendering the provision in question nugatory. When is the law-making power to enact this restrictive legislation and obey the mandate of the Resolution? No limit of time is stated and until the Legislature chooses to act, the United States laws could not go into effect. The use of the words "upon such conditions as are now or *may hereafter* be allowed," indicates that Congress may hereafter alter those conditions now allowed by the laws of the United States, but that until Congress does so alter them the conditions prescribed by the laws *now* in force must prevail.

On behalf of petitioners, the decision in the case of *Chew Heong v. The United States*, 112 United States 536, is relied upon in support of the contention that the Resolution should not be given retrospective operation so as to debar petitioners from entering. That decision was based very largely upon the fact that the Court, in construing the statutes there under consideration, felt it its duty to so construe them, if possible, as not to repeal in effect the provisions of a prior treaty with China. In that respect the case differs from that at bar, for the Hawaiian Islands have no such treaty. The existing United States treaty with China has been held not to bar just such legislation as is here contended against. The decision was also based on the ground that in the opinion of the Court the language used in the statutes did not clearly indicate an intention on the part of Congress to give the statutes a retrospective operation and that consequently they must be held to operate prospectively only. The correctness of the rule there laid down is, as already stated above, undenied, but the fact remains that after all the Court in this case must, as did the Court in that case, find the intention of Congress from the language of the instrument which is the subject of construction. The adjudication in that case cannot therefore be of much real value in this case.

40

Having held that the United States laws in relation to the immigration of Chinese are now in force in the Hawaiian Islands and that such laws apply as well to cases where permits were issued prior to the passage of the Resolution as to other cases, it follows, in my opinion, that this Court has no jurisdiction to construe the United States laws or to pass upon the question of the validity of respondent Brown's appointment or of the extent of his powers as a Chinese Inspector under those statutes or of whether he lawfully holds petitioners in his custody. The case presented is that of a Federal officer, claiming to act under Federal laws and justifying his detention of petitioners by virtue of the provisions of such laws, and is cognizable only in a Court of the United States.

The United States Constitution, Article III, Section 1, provides, "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as Congress may, from time to time, order and establish; and, Section 2, "The judicial power shall extend to all cases in law and equity arising under this Constitution, *the laws of the United States*, and treaties made, or which shall be made, under their authority." Under the authority thus conferred, Congress has established certain inferior Courts, but none yet in these islands. This Court is not a Court of the United States. See *Republic v. Edwards*, 11 Haw.

One evil which the framers of the United States Constitution sought to avoid by leaving it solely to United States Courts to interpret and enforce United States laws, was the giving of differing or antagonistic interpretations to the same law intended to apply in all States alike by the Courts of different States, which would cause confusion and uncertainty in the application of such law and perhaps lead to disagreements or even to a breach of the peace between different States. The present seems to me to be a case falling with the reasons for the jurisdictional provision in the Constitution. The Courts of the various States might easily hold and lay down conflicting views as to how the statutes now in question ought to be construed.

In *Ableman v. Booth* and *United States v. Booth*, 21 Howard 506, a judge of the Supreme Court of Wisconsin in the first of those two cases of habeas corpus "claimed and exercised the right to supervise and annul the proceedings of a commissioner of the United States, and to discharge a prisoner, who had been committed by the commissioner for an offense against the laws of this" (the United States) "government and this exercise of power by the judge was afterwards sanctioned and affirmed by the Supreme Court of the State." In the second case, "the State Court went a step further and claimed and exercised jurisdiction over the proceedings and judgment of a District Court of the United States, and upon a summary and collateral proceeding, by habeas corpus, set aside and annulled its judgment, and discharged a prisoner who had been tried and found guilty of an offense against the laws of the United States, and sentenced to imprisonment by the District Court." In the decision, which is an elaborate and well-considered one, the Supreme Court of the United States, says: "These propositions are new in the jurisprudence of the United States, as well as of the States; and the supremacy of the State Courts over the Courts of the United States, in cases arising under the Constitution and Laws of the United States, is now for the first time asserted and acted upon in the Supreme Court of a State. ＊ ＊ ＊

"If the judicial power exercised in this instance has been reserved to the States, no offense against the laws of the United States can be punished by their own Courts, without the permission and according to the judgment of the Courts of the State in which the party happens to be imprisoned; for, if the Supreme Court of Wisconsin possessed the power it has exercised in relation to offenses against the Act of Congress in question, it necessarily follows that they must have the same judicial authority in relation to any other power of the United States; and consequently, their supervising and controlling power would embrace the criminal code of the United States, and extend to offenses against the revenue laws, or any other law intended to guard the different departments of the General

Government from fraud or violence. And it would embrace all crimes, from the highest to the lowest; including felonies which are punished with death as well as misdemeanors, which are punished by imprisonment. And, moreover, if the power is possessed by the Supreme Court of Wisconsin, it must belong equally to every other State in the Union, when the prisoner is within its territorial limits; and it is very certain that the State Courts would not always agree in opinion; and it would often happen, that an act which was admitted to be an offense and justly punished, in one State, would be regarded as innocent, and indeed as praiseworthy, in another. *    *    *

"There can be no such thing as judicial authority, unless it is conferred by a Government or sovereignty; and if the judges and Courts of Wisconsin possess the jurisdiction they claim, they must derive it either from the United States or the State. It certainly has not been conferred on them by the United States; and it is equally clear it was not in the power of the State to confer it, even if it had attempted to do so; for no State can authorize one of its judges or Courts to exercise judicial power, by habeas corpus or otherwise, within the jurisdiction of another and independent government. And although the State of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States. And the powers of the General Government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge or a State Court, as if the line of division was traced by landmarks and monuments visible to the eye. And the State of Wisconsin had no more power to authorize these proceedings of its judges and Courts, than it would have had if the prisoner had been confined in Michigan, or in any other State of the Union, for an offense against the laws of the State in which he was imprisoned. *    *    *

"We do not question the authority of State Court, or judge, who is authorized by the laws of the State to issue the writ of habeas corpus to issue it in any case where the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire, in this mode of proceeding, for what cause and by what authority the prisoner is confined within the territorial limits of the State sovereignty. And it is the duty of the marshal, or other person having the custody of the prisoner, to make known to the judge or court, by a proper return, the authority by which he holds him in custody. This right to inquire by process of habeas corpus, and the duty of the officer to make the return, grows necessarily out of the complex character of our Government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the Constitution of the United States, independent of the other. But after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another government. and that neither the writ of habeas corpus, nor any other process issued under State authority, can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offense against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known, by a proper return, the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate or process of any other Government. And consequently it is his duty not to take the prisoner, nor suffer

him to be taken, before a State judge or Court upon habeas corpus issued under State authority. No State judge or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him, or to require him to be brought before them. And if the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal or other authorized officer or agent of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the Court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence." * * *

"If there was any defect of power in the commissioner, or in his mode of proceeding, it was for the tribunals of the United States to revise and correct it, and not for a State Court."

This statement of the law is clear and to the point. If in this case there is any defect in the power of the United States officer, or in his mode of proceeding, it is for the tribunals of the United States to revise and correct it, and not for this Court. That no United States Court has been established here yet, and that great inconvenience may result from this Court's holding that it has no jurisdiction, cannot of itself confer jurisdiction upon the Court. The Hawaiian Government had not and has not the power to confer upon this Court jurisdiction to construe or judicially enforce United States laws, and, the United States Government, though possessing the power to confer such jurisdiction has not yet done so. For such failure and the inconvenience resulting therefrom, Congress alone is responsible.

The writ issued herein should be discharged for lack of jurisdiction, and the petitioners should be remanded to the custody of respondents, and it is so ordered.

The foregoing opinion is concurred in by Justice Whiting.

*J. A. Magoon & R. D. Silliman, Robertson & Wilder,* and *Humphreys & Gear* for the petitioners.

*W. O. Smith, Attorney-General,* and *Thurston & Carter* for the respondents.

DISSENTING OPINION OF CHIEF JUSTICE JUDD.

While agreeing with many of the principles of law held in this case by a majority of the Court, I am still unable to agree with its conclusions, and respectfully dissent, especially on the subject of the jurisdiction of this Court in passing upon Federal questions. I am of the opinion that until Congress has provided for a Federal Court in these islands, we must meet and decide all questions of law that are properly brought before us. Any other view would deprive our Courts of much of its jurisdiction, as, for example, that in Admiralty, which is by United States statutes vested solely in United States Courts. I adhere to my view as set forth in my opinion in the matter of the application of Aiona and others for a Writ of Habeas Corpus decided on the 15th of December, 1898, as hereinbelow set forth.

Following is the dissenting opinion referred to:

IN THE MATTER OF THE PETITION OF AIONA, KOW SING, AH TIM, TOW LIN, JAM YORK, AH HOY, CHUN SUN, AH CHOW, AND LUM HOO, FOR A WRIT OF HABEAS CORPUS.

ORIGINAL. BEFORE CHIEF JUSTICE JUDD.

SUBMITTED DECEMBER 12, 1898. DECIDED DECEMBER 15, 1898.

OPINION.

Following are the pleadings in this case:

The petition of Aiona, Kow Sing, Ah Tim, Tow Lin, Jam York, Ah Hoy, Chun Sun, Lum Hoo and Ah Chow, respectfully represents as follows, to wit:

That on or about the 4th day of December, A. D. 1898, they arrived at Honolulu, Republic aforesaid, on the steamship "City of Peking," from China, and that petitioners have com-

plied with all the provisions of the laws of the Republic of Hawaii relating to Chinese immigration, and the regulations promulgated under said laws, and that they are in every way qualified and entitled to land in the Hawaiian Islands.

That your petitioners are unlawfully imprisoned and restrained of their liberty by one Frank B. McStocker, Collector-General of Customs, at Mauliola, Honolulu, Island of Oahu;

That said F. B. McStocker has prohibited access to petitioners by their friends, and attorneys; and that he threatens to deport petitioners from this country on the steamship "Coptic" now in the port of Honolulu and about to sail for China.

That your petitioners are informed and believe that the cause of their restraint is the alleged belief of said F. B. McStocker that the laws of the Republic of Hawaii relating to Chinese immigration are not in force and that they have been superseded by certain Acts of Congress of the United States under which Acts said petitioners are not qualified to land in these islands, all of which your petitioners deny.

Wherefore, petitioners pray that a Writ of Habeas Corpus may be granted, directed to the said F. B. McStocker, commanding him to have the bodies of your petitioners before the Honorable A. F. Judd, Chief Justice of the said Court, at a time and place therein specified to do, receive and submit to what shall then and there be considered by the Court concerning them with this Writ, and that petitioners may be restored to their liberty.

Dated at Honolulu, December 6, 1898.

(Signed)                              R. D. SILLIMAN,
          In behalf of petitioners, and sworn to by him.


WRIT.

*In the name of the Republic of Hawaii:*

*To F. B. McStocker, Greeting:*

We command that upon receipt of this Writ you have and produce before the Honorable A. F. Judd, Chief Justice of the Supreme Court at his Chambers, Aliiolani Hale, Honolulu, at 10 o'clock a. m. on Wednesday, December 7, 1898, the bodies of Aiona, Lum Hoo, Kow Sing, Ah Tim, Tow Lin, Jam York, Ah Hoy, Chun Sun and Ah Chow, who, it is alleged, are unjustly imprisoned and restrained of their liberty, to do and

receive what shall then and there be considered concerning them in this behalf.

And have you there this Writ, with your doings thereon.

Witness the Honorable A. F. JUDD, &c.

RETURN.

Now comes F. B. McStocker, Collector-General of Customs of the Hawaiian Islands, and for return to this Writ served upon him herein, respectfully shows to this Honorable Court as follows:

First: The persons answering to the names set forth in said petition and in said Writ were in the custody of himself and J. K. Brown, United States Chinese Inspector, at the time alleged therein, and he here brings them and each of them before this Honorable Court as in said Writ directed. And he hereby shows the cause of the detention of said petitioners as follows:

1. That certain of said petitioners, namely: Aiona, Kow Sing, Ah Tim, Tow Lin, and Jam York, are Chinese laborers; and certain others of them, namely: Ah Hoy, Chun Sun, Ah Chow and Lum Hoo, are travelers; and all of said petitioners are Chinese subjects who arrived at the port of Honolulu on the steamship "City of Peking" on the 4th day of December, A. D. 1898, from ports in China.

2. That upon arrival of the petitioners they were removed to the quarantine station at Mauliola for the purpose of performing quarantine duties, and were subjected to the inspection of the Collector-General of Customs as aforesaid, and of the said J. K. Brown, United States Chinese Inspector as aforesaid. That upon such examination it was ascertained that none of them had complied with the provisions and requirements of the Treaty existing between the United States of America and the Empire of China, nor of the United States Statutes, relating to the immigration of Chinese into the United States, nor of the regulations of the United States Treasury Department respecting the exclusion of Chinese.

Wherefore, it was decided by the respondent and said J. K. Brown, United States Chinese Inspector as aforesaid, that said petitioners, each and all of them, were not entitled to enter the Hawaiian Islands; and that they should be held to await the

arrival of a steamer returning to China that they might be deported.

(Signed)                                    F. B. McStocker,
                                        And sworn to by him.

## Replication to Return.

Now comes the above named petitioners by their attorneys, and in reply to the return of said F. B. McStocker, to their said petition, say:

That neither the United States Statutes relating to the immigration of Chinese into the United States nor the regulations of the United States Treasury Department respecting the exclusion of Chinese have been extended to the Republic of Hawaii, nor have they any force within said Republic.

That neither the said F. B. McStocker, nor the said J. K. Brown, have any authority to enforce said statutes and regulations within the Republic of Hawaii, nor have they, or either of them, any legal authority to restrain said petitioners of their liberty.

That said petitioners, and each of them, are bona fide holders of permits or documents entitling them to land in the Republic of Hawaii, which were issued to them prior to the annexation of said Republic to the United States of America on the 12th day of August, 1898.

That said permits or documents have never been revoked or canceled, and are still in full force and effect; and that the said annexation of said Republic to the United States did not and was not intended to have any retrospective operation.

Dated December 9, 1898.  ·

Signed by petitioners' counsel.

## By the Court.

The case presents questions of great difficulty, and I am fully impressed with the responsibility devolving upon me in deciding them. I have no precedents to refer to, and I doubt whether any conditions exactly similar to those surrounding this case have existed anywhere.

Up to the 7th day of July, 1898, the Government of the Hawaiian Islands was an independent Republic. At that date (the Congress of the United States having passed the Joint

Resolution of Annexation on the 6th of July), it became law by the approval of the President of the United States. One of its clauses reads:

"There shall be no further immigration of Chinese into the Hawaiian Islands, except upon such conditions as are now or may hereafter be allowed by the laws of the United States; and no Chinese, by reason of anything herein contained, shall be allowed to enter the United States from the Hawaiian Islands."

By another clause of the same Resolution it is provided that

"Until Congress shall provide for the Government of such islands, all the civil, judicial and military powers exercised by the officers of the existing government in said islands, shall be exercised in such manner as the President of the United States shall direct; and the President shall have power to remove said officers and fill the vacancies so occasioned."

And by proclamation by the President of the United States made on the 12th of August, 1898, the existing officers of the Republic of Hawaii were continued in office.

It is contended by the respondent in this case that the clause in the Resolution forbidding the further immigration of Chinese into this country is now a part of the fundamental law of these islands. And that thereafter no Chinese can be admitted into this country except as in accordance with the laws of the United States. The petitioners show bona fide permits to enter these islands issued to them prior to the 7th day of July, 1898, in accordance with various statutes of Hawaii enacted before the passage of the Joint Resolution of Annexation, and while it was an independent sovereignty. These petitioners are now stopped at the threshold of this country because they do not possess the qualifications required by the laws of the United States to enter its domain. Since by the following clause of the Joint Resolution, "The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the Treaties so extinguished, remains (shall remain) in force until the Congress of the United States shall otherwise determine, excepting such legislation as is inconsistent with this Joint Resolution," I feel constrained to hold that the clause of the Resolution forbidding

further Chinese immigration has virtually repealed the Hawaiian statutes which allowed a restricted Chinese immigration and authorized the issue of permits to Chinese who have complied with certain requirements to enter this country, they being · inconsistent therewith. These permits are of various classes and those presented in this case are, first, permits to Chinese to re-enter this country, the applicants having been prior residents thereof, and secondly, Chinese who are allowed a limited residence in this country under certain restrictions.

The crucial question in this case is whether Congress intended in the Resolution that the clause forbidding *further* Chinese immigration should have a retrospective operation and render invalid these permits. Before discussing this question, it becomes necessary to say that up to this date, so far as we know, the report of the Commissioners appointed under the Resolution to recommend to Congress such legislation concerning these islands as they shall deem necessary and proper, has not been presented to Congress nor has any Act been passed by Congress providing for the government of the newly acquired territory, and more especially, no legislation in order to carry into effect the existing laws of the United States respecting Chinese immigration has been enacted.

Hawaiian laws as to the character of the Chinese immigrants allowed to enter this country are totally at variance with those of the United States. The United States allow immigrants of the mercantile class upon certain conditions, and exclude laborers, except upon certain conditions. By Hawaiian laws, merchants are forbidden to enter this country for the first time, while laborers are not only allowed to emigrate to this country for limited residence, but they are greatly desired by some for agricultural labor.

I have no difficulty in holding that Hawaiian authorities have no power now to do any act which, by the granting of new permits will allow future immigration of Chinese to this country, since my view is that Hawaiian statutes on the subject are ipso facto repealed by the passage of the Joint Resolution.

Whether the United States laws can be enforced in this country without further legislation of Congress is a very different question. A strong argument is made that there are no officers constituted by law in this country to execute the United States statutes. We are not a conquered country, and therefore not subject to such orders and decrees as might be made by the conquering power. We have been absorbed by the United States by agreement, and for the convenience of Congress and until it has had sufficient time to provide for our government, our existing laws remain in full force, unless they are inconsistent with the Resolution.

But it is contended by counsel for petitioners that if it be considered for the sake of argument that the United States statutes regulating Chinese immigration are in force in this country and that Hawaiian Customs officials are authorized to execute those laws, nevertheless the clause of the Resolution forbidding Chinese immigration into this country was not intended to apply to cases of individuals (Chinese) who have arrived at this port of Honolulu and are seeking to obtain admission into this country by virtue of the permissions given them by the statutes of Hawaii granted prior to the passage of the Resolution. The injustice and oppression which would be visited upon these petitioners by being refused to land, when they came to this country relying in good faith upon the permission granted, is apparent to every one.

I am averse to hold that the Congress of the United States deliberately intended to inflict this injury.

Before proceeding with the discussion of this question whether the Resolution has a retrospective effect, I wish to refer again to the anomalous position in which I am placed. By the Constitution of Hawaii it is provided that "retrospective laws shall never be enacted." There is no such prohibition in the Constitution of the United States. This Court is not a Court of the United States, but, considering that this case should be decided as a Court of the United States would, in my opinion, decide it, I follow the rule of construction adopted

in the United States, that a statute should have a prospective operation unless its terms show clearly a legislative intention that it should operate retrospectively. The rule is stated in 23 American and English Encyclopedia of Law, p. 448, as follows:

"It may be laid down as a fundamental rule in construing statutes so worded as to admit of a construction which would render them retrospective as well as prospective, that a prospective operation only is to be given, unless a legislative intent to the contrary is declared, or necessarily implied from the circumstances of the language used."

In Sutherland on Statutory Construction, Section 463, the author says:

"As retrospective laws are generally unjust and in many cases oppressive, they are not looked upon with favor. Statutes not remedial will therefore not be construed to operate retrospectively, even when they are not obnoxious to any constitutional objection, unless the intent that they shall do so is plainly expressed or made to appear. Where the intention as to being retrospective is doubtful the statute will be construed as prospective only."

The clause of the Resolution under discussion is not "remedial" or "declaratory."

Section 464:

"A statute should not receive such construction as to make it impair existing rights, create new obligations, impose new duties in respect of past transactions, unless such plainly appear to be the intention of the legislature. In the absence of such plain expression of design, it should be construed as prospective only, although its words are broad enough in their literal extent to comprehend existing cases."

Cooley, "Constitutional Limitations," p. 455:

"There is no doubt of the right of the legislature to pass statutes which reach back to and change or modify the effect of prior transactions, provided retrospective laws are not forbidden, *eo nomine*, by the state constitution; and provided, further, that no other objection exists to them than their retrospective character. Nevertheless, legislation of this character is exceedingly liable to abuse, and it is a sound rule of construc-

tion that a statute should have a prospective operation only, unless its terms show clearly a legislative intention that it should operate retrospectively."

Counsel for petitioners rely upon *Chew Yeong v. United States*, reported in 112 U. S., p. 536. The head note is this:

"Courts uniformly refuse to give to statutes a retrospective operation whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature."

This case, the opinion having been written by Mr. Justice Harlan, Justices Field and Bradley only dissenting, was decided in 1884. The essential facts of the case are as follows:

A Chinaman arrived in the United States in 1880, remaining there until 1881, when he departed for Honolulu and remained there until September, 1884, when he returned to the United States. During his absence the Chinese Restriction Acts of 1882 and 1884 were enacted. As he had no certificate as required by those Acts, he was denied admission. On habeas corpus the case went to the Supreme Court of the United States upon a certificate of division, and it was there held that he was entitled to enter and remain in the United States; and the reasoning of the Court is that, since by the Treaty between the United States and China of 1880, the Chinaman in question was allowed to go from and come to the United States of his own free will, if he was in the United States at the date of that Treaty, in order to establish his right of re-entry, after the Restriction Acts had passed, he would have to produce a "certificate of residence." It was impossible for him to produce at the time of his attempted re-entry the certificate required, because he had left the United States before the passage of the new treaty and statutes which required, as a pre-requisite of his re-entering, the "certificate of residence." He had left the United States before the passage of the Acts which subjected him to the burden of procuring the certificate. The Court said: "That the legislative enactments in question should receive such a construction, if possible, as would save the right of this China-

man to re-enter the country under the provisions of the previous treaty and give full effect to the intention of Congress," and (quoting from *United States v. Kirby*, 7 Wallace, p. 486):

"General terms should be so limited in their application as not to lead to injustice, oppression or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

The Court continues:

"What injustice could be more marked than by legislative enactment to recognize the existence of a right by Treaty to come within the limits of the United States, and at the same time to prescribe as the only evidence permissible to establish it, the possession of a Collector's certificate that could not possibly have been obtained by the person to whom the right belongs, or to prevent the re-entry of a person into the United States upon the ground that he did not upon his arrival from a foreign port, produce a certain certificate under the hand and seal of a Collector and upon forms prescribed by the Secretary of the Treasury, which neither that nor any other officer was authorized or permitted to give prior to the departure of such person from this country."   *   *   *   "Courts uniformly refuse to give retrospective operation whereby rights previously vested are injuriously affected unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intent of the legislature."

The Court cites numerous cases affirming this principle.

In the case before me, I ask, what injustice could be more marked than to require as a pre-requisite to certain of the petitioners' rights to re-enter these islands, the production of a certificate of residence in the United States required by the Statutes of the United States when it would be impossible for them to possess it, since none of them were ever in the United States? Can a residence in Hawaii be construed to be a residence in the United States because subsequent to such residence Hawaii became United States territory?

A "Chinese laborer" can obtain permission to re-enter the United States if he has a lawful wife, child or parent in the

United States, or property therein of the value of $1,000, or debts to that amount due him pending settlement. These particulars must be put in writing and deposited with a Collector of Customs. Also a certificate of registration before a Commissioner of Internal Revenue with particulars descriptive of his person, his photograph, etc. These must be identified and found correct and then he may receive a certificate of his right to return, which must be exercised within one year. The certificate must be procured by the man himself while in the United States.

A Chinese official, teacher, student, merchant, or traveler, not a *laborer*, to gain admission in the United States must present a certificate from his own government or the government where he last resided, vised by the diplomatic or consular representatives of the United States where he last resided.

It is absolutely impossible that any of the petitioners could have obtained either of the above prescribed certificates.

Their status is such as will not allow them to come into this country in accordance with the United States law. It may be said that the right to enter a foreign country is not a right, unless secured by Treaty, but I can see no difference so far as these petitioners are concerned between the right to enter a foreign country secured by Treaty than one secured by the statute of the country which the Chinese desires to enter. The United States Courts treat a law enacted by Congress as equal in validity with a Treaty, and if the Statute is in contravention of a former Treaty, the Courts recognize the Statute as being the last expression of the will of Congress, and valid.

I can find nothing in the Resolution which manifests the intention of Congress to include in the operation of the United States statutes, Chinese who have permits to enter this country under Hawaiian law and I am unwilling, without more explicit legislation, to say that the Congress of the United States intended to perpetrate the injustice of shutting the doors of Hawaii in the faces of those who seek admission by virtue of their permits and without notice that they had been annulled by the

fact of the Annexation of Hawaii to the United States. They had a right to rely upon the provisions of the Resolution of Annexation itself—that until Congress should provide for the Government of these islands, Hawaiian legislation continued in force, and though future immigration was forbidden, there was nothing in the Resolution to warn them that their permits were invalid.

That Congress could not have intended that the United States statutes respecting Chinese immigration should have a retrospective operation in the Hawaiian Islands, is evidenced by the fact that the Resolution itself does not provide for any means of punishing infractions of the United States laws, either against the ship-master who brings Chinese here without complying with the laws, or for the deportation of the Chinese who are found here without the necessary credentials or for the appointment of a United States Marshal to execute the law, or for the establishment of an United States Court, or Commissioner, or other official who shall have the authority to adjudge whether the law has been violated.

The Resolution contains the provision that in the interim between the passage of the Resolution and the enactment of a Government for these islands, the existing powers of its officials, civil, judicial and military shall be vested in such persons and be " 'exercised in such manner' as the President of the United States shall direct." This power to the President would not permit him to direct an Hawaiian official to perform duties not authorized by or contrary to such Hawaiian law. The respondent is the Collector-General of Customs of Hawaii, and by the terms of the Resolution which in the interim continues the "existing Customs relations of the Hawaiian Islands with the United States and other countries," he executes Hawaiian laws. Honolulu is still a "foreign port" in this respect. I cannot see what protection the respondent would have in a Hawaiian Court, if he should undertake to do an act not authorized by Hawaiian law.

The United States statutes respecting Chinese immigration

are not self-executory and are not capable of being enforced where there are no legally authorized officials to enforce them.

To say that such provisions of the enactments of the United States are enforceable as are applicable in favor of or against such Chinese whose status may, by analogy, be similar to that of Chinese who should seek to enter the mainland of the United States in a "home port" would imply a confession that United States statutes cannot be strictly enforced here. Would it not be a doubtful step to take to deviate from the law, although extremely grateful to the recipients of permission to land, if given? I can find no discretion granted to execute a portion of the United States laws on this subject and ignore other portions. In saying this, I wish distinctly to disavow any intention of seeming to influence any action of the Inspector of Chinese Immigration, Mr. J. K. Brown, who is here under instructions from the Secretary of the Treasury of the United States.

There is nothing in the Resolution itself, or in the circumstances surrounding its passage to indicate that it was the intention of Congress to repudiate any act of the Hawaiian Government previously done. The whole scope of the Resolution indicates a contrary intention as shown by the assumption of the Hawaiian national debt, the continuance of our customs laws and customs relations, the continuance of our officials in office, etc.

I do not think I have gone beyond the issue before the Court, in discussing the question whether the United States statutes concerning Chinese immigration are now enforceable in Hawaii, for if Congress has provided no machinery by which those laws can be executed, it furnishes an argument that Congress could not have intended them to go into effect immediately.

My judgment is that petitioners are entitled to their discharge from respondents' custody, and that they be allowed to enter these Hawaiian Islands.